**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHN AYALA,

     Plaintiff,

     v.

KENNETH McCORMICK, et al.,

     Defendants.

CIVIL ACTION NO. 09-3484 (MLC)

**MEMORANDUM OPINION**

**COOPER, District Judge**

     The plaintiff, John Ayala (the "plaintiff"), commenced this action against the defendants Kenneth McCormick ("Sergeant McCormick") and Thomas Fisher ("Officer Fisher") (collectively, the "defendants"), police officers within the Raritan Borough Police Department, as well as the fictitious defendants, "3 John Doe Official[s]," alleging, <u>inter alia</u>, (1) excessive, unlawful, and deadly force, and (2) denial of medical care (the "Remaining Claims"), in violation of 42 U.S.C. § ("Section") 1983.  (<u>See</u> dkt. entry no. 1, Compl.; dkt. entry no. 84-1, Defs.' Br. at 6, 31 (explaining that Complaint, though vague, can be read to assert that defendants violated Section 1983 by engaging in excessive, unlawful, and deadly force, and denying plaintiff medical care).)[1]

_____

[1] The plaintiff subsequently filed a document that listed his causes of action as follows: "2C:5-2, official misconduct"; "2C:12-1A, excessive force by law enforcement"; "2C:12-1, serious bodily

The defendants now move for summary judgment in their favor and against the plaintiff, pursuant to Federal Rule of Civil Procedure ("Rule") 56, as to the Remaining Claims (the "Motion").  (<u>See</u> dkt. entry no. 84, Notice of Defs.' Mot.)  The plaintiff opposes the Motion.  (<u>See generally</u> dkt. entry no. 91, Opp'n Br.)

The Court will resolve the Motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b).  The Court, for the reasons stated herein, will grant the Motion.

I.    **SUMMARY JUDGMENT STANDARD**

Motions for summary judgment are governed by Rule 56, which provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is

---

injury"; "2C:24-8, endangering the welfare of disabled"; "2C:12-1, endangering an injured victim"; "2C:28-4, falsifying police reports; medical neglect"; "gross neglect"; "excessive force"; "deadly force"; "unlawful force"; "discrimination"; and "denial of medical attention."  (<u>See</u> dkt. entry no. 1-5, Pl. Cause of Action List.)  In the plaintiff's opposition to this motion for summary judgment, the plaintiff – now represented by pro bono counsel – concedes all of the previously pleaded causes of action except for (1) excessive, unlawful, and deadly force, and (2) denial of medical care.  (<u>See</u> dkt. entry no. 91, Opp'n Br. at 15-16.)

'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." <u>Lamont v. New Jersey</u>, 637 F.3d 177, 181 (3d Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The burden on the movant may be discharged by pointing out to the district court that there is an absence of evidence supporting the nonmovant's case. <u>See</u> <u>Celotex</u>, 477 U.S. at 323.

If the movant demonstrates an absence of genuinely disputed material facts, then the burden shifts to the nonmovant to demonstrate the existence of at least one genuine issue for trial. <u>See</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986); <u>Williams v. Bor. of W. Chester, Pa.</u>, 891 F.2d 458, 460–61 (3d Cir. 1989).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (internal quotation marks omitted).  The nonmovant cannot, when demonstrating the existence of issues for trial, rest upon argument; the nonmovant must show that such issues exist by referring to the record.  <u>See</u> Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor.  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007);

Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  If the
nonmovant fails to demonstrate that at least one genuine issue
exists for trial, then the Court must determine whether the movant
is entitled to judgment as a matter of law.  See McCann v. Unum
Provident, 921 F.Supp.2d 353, 357 (D.N.J. 2013).  "A movant is
entitled to judgment as a matter of law if, at trial, no reasonable
jury could find for the non-moving party."  Id.

## II.  FINDINGS OF FACT

On August 1, 2007, Sergeant McCormick was dispatched to an ice
cream parlor located in Raritan, New Jersey, in response to a
report of a man acting in a disorderly manner.  (See dkt. entry no.
84-2, Defs.' Statement of Undisputed Material Facts ("Defs.' SOF")
at ¶¶ 5, 15; dkt entry no. 91-1, Pl.'s Response to Statement of
Undisputed Material Facts ("Pl.'s SOF") at ¶¶ 5, 15.)  When
Sergeant McCormick arrived at the scene, he was briefed by Officer
Kathleen Sausa.  (See Defs.' SOF at ¶ 16; Pl.'s SOF at ¶ 16.)
Officer Sausa informed Sergeant McCormick that witnesses observed
the plaintiff crawling around on all fours near the ice cream
parlor, approaching a pole while on all fours and lifting his leg
as if he was urinating, and sitting down in front of the front door
of the ice cream parlor just prior to the Officer Sausa's arrival.
(See id.)  Sergeant McCormick observed the plaintiff sitting on the
ground blocking the ice cream parlor's entrance, preventing

customers from entering and exiting.  (See Defs.' SOF at ¶ 17;
Pl.'s SOF at ¶ 17.)

Sergeant McCormick then radioed for additional officers to
converge on the scene; he was motivated to radio for assistance
because the plaintiff was very muscular and he believed having a
greater police presence was in his best interests due to the amount
of bystanders present.  (See Defs.' SOF at ¶ 19; Pl.'s SOF at ¶
19.)  The parties' versions of events diverge at this point.  The
defendants allege that while Sergeant McCormick awaited Officer
Fisher's arrival, he attempted to communicate with the plaintiff.
(See Defs.' SOF at ¶ 20; Pl.'s SOF at ¶ 20.)  Sergeant McCormick
alleges that while the plaintiff did not respond to verbal
commands, the plaintiff did make eye contact with him and tracked
Sergeant McCormick with his eyes.  (See Defs.' SOF at ¶ 20, 22.)

When Officer Fisher arrived on the scene, he was briefed by
Sergeant McCormick and Officer Sausa.  (See Defs.' SOF at ¶ 24;
Pl.'s SOF at ¶ 24.)  The defendants proceeded to ask the plaintiff
a series of questions, including whether he understood English,
whether he was hurt, and whether he needed assistance.  (See Defs.'
SOF at ¶¶ 25, 27-28.)  The defendants allege that the plaintiff did
not respond verbally to any of the commands, but he did nod his
head "yes" when the officers asked whether he understood English.
(See id.)  Officer Fisher then told the plaintiff that he would
help him up if he needed assistance.  (See Defs.' SOF at ¶ 29.)

When he received no reply, Officer Fisher said "please stand up and try to move to the bench to get out of peoples' way so they can go about their business going in and out." (See dkt. entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. B, Fisher Dep. 34:6-9, May 20, 2013.) The plaintiff again did not respond, and Officer Fisher proceeded to walk to the plaintiff's right side where he noticed a half marijuana cigar under the plaintiff's pocket on the ground. (See Defs.' SOF at ¶¶ 33-34.)

Officer Fisher then advised the plaintiff that if he did not stand up he would be placed under arrest for disorderly conduct because he was restricting the flow of patrons in and out of the ice cream parlor and causing a commotion. (See id. at ¶ 35.) When the plaintiff still did not respond, Officer Fisher reached out to assist the plaintiff and touched his arm. (See id. at ¶ 36.) The plaintiff's arm immediately tensed up, and he pulled his arm away from Officer Fisher's grasp in a willful and violent manner. (See id.) Sergeant McCormick testified that he thought the plaintiff was going to start fighting the officers "with everything he had." (See id. at ¶ 37.)

As soon as the plaintiff pulled his arm away, Officer Fisher rolled the plaintiff onto his stomach and verbally instructed him to stop resisting arrest. (See id. at ¶ 40; Fisher Dep. 38:19-39:9.) The plaintiff instead kept his arms underneath him, tried to twist and pull away from the officers, and began kicking. (See

Fisher Dep. 39:10-12.)  At this time, the officers were unaware of whether the plaintiff had any weapons, as he had not yet been searched.  (See Defs.' SOF at ¶ 39.)  While Officer Fisher attempted to gain control of the plaintiff's right arm, Sergeant McCormick tried to gain control of the plaintiff's left side through the use of a compliance hold.  (See id. at ¶¶ 40-41.) Sergeant McCormick utilized a straight arm bar, a type of compliance hold he was taught during his police training.  (See id. at ¶¶ 42-43; dkt. entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. A, McCormick Dep. 47:3-7, May 20, 2013.)  During the time the officers attempted to handcuff the plaintiff, his arms, neck, and head were providing resistance to the officers and were straining against their efforts.  (See Defs.' SOF at ¶ 45.) Because the plaintiff was kicking his legs, a third officer, Officer Raniere restrained the plaintiff's legs.  (See id. at ¶¶ 48-49.)

   Sergeant McCormick eventually used an additional compliance hold on the plaintiff by placing his knee on the plaintiff's back and neck.  (See id. at ¶ 50.)  Sergeant McCormick learned this type of compliance hold during his police training.  (See id. at ¶ 51.) Soon after, the plaintiff exclaimed: "enough, you have me already," and the defendants were then able to get both of the plaintiff's arms behind his back, handcuff him, and arrest him.  (See id.) Sergeant McCormick testified that the plaintiff's arms were not

7

ripped backwards, his shoulders were free to rotate during the act of handcuffing, and that once the plaintiff was handcuffed, the officers ceased the use of all compliance holds.  (See id. at ¶¶ 52-53.)  Officer Fisher testified that the plaintiff did not fall to the ground at any point during the arrest.  (See Fisher Dep. 41:25-42:2.)

Once the plaintiff was handcuffed, he was conversant with the officers and responsive to them.  (See Defs.' SOF at ¶ 56.)  After the arrest, Sergeant McCormick cancelled the ambulance which had been dispatched automatically.  (See id.)  The plaintiff was then transported to the police station, which was approximately .1 miles or 500-600 feet away from the ice cream parlor.  (See id. at ¶ 57.)

While at the police station, the plaintiff was compliant and responded to all verbal commands.  (See id. at ¶ 61.)  The plaintiff informed Officer Fisher that he suffers from a seizure disorder.  (See id. at ¶ 59.)  Officer Fisher asked the plaintiff if he needed medical attention, which the plaintiff declined.  (See id.)  Sergeant McCormick similarly asked the plaintiff whether he needed either medication to control his seizures or an ambulance, and the plaintiff declined both offers.  (See id. at ¶ 60.)  The defendants both testified that even after learning that the plaintiff suffers from a seizure disorder, there was nothing about the plaintiff's demeanor during the encounter in front of the ice cream parlor that

led them to think that he was having a seizure.  (See McCormick Dep. 50:1-7; Fisher Dep. 47:25-48:5.)[2]

The plaintiff, on the other hand, testified that he does not recall any of the events that occurred prior to or during his arrest because he was having a seizure.  (See Defs.' SOF at ¶ 82; Pl.'s SOF at ¶ 82.)  The plaintiff argues that the seizure rendered him incoherent, and thus he denies making eye contact with the officers, nodding his head in response to their questions, and resisting.  (See e.g., Pl.'s SOF at ¶¶ 14, 22, 28, 41.)  The plaintiff states that the only thing he recalls from his arrest was waking up at the police station handcuffed to a bench.  (See Defs.' SOF at ¶¶ 65, 82; Pl.'s SOF at ¶¶ 65, 82.)  Because he does not recall the arrest, the plaintiff relies exclusively on the eyewitness testimony of James Sorace and Paul Gsell (collectively the "eyewitnesses") as evidence for his excessive force claim. (See Defs.' SOF at ¶ 83; Pl.'s SOF at ¶ 83; dkt. entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. C, Ayala Dep. 489:4-17, Feb. 26, 2013.)

---

[2] The defendants also submit the affidavit of Candace Bauer, an employee at the ice cream parlor and eyewitness to the arrest. (See generally dkt. entry no. 84-8, Aff. of Candace Bauer.)  Bauer corroborates the defendants' version of the events.  (See generally id.)  Bauer also averred that: (1) the plaintiff resisted the officers' attempts to move him and handcuff him; (2) she did not believe the plaintiff was suffering from a seizure; (3) she never saw the officers hit, beat, or slam the plaintiff or rip his arms back; and (4) she believed the police acted appropriately.  (See id. at ¶¶ 10-14, 17.)

Sorace testified he was standing in his business across the street from the ice cream parlor at the time of the plaintiff's arrest.  (See Defs.' SOF at ¶ 85; Pl.'s SOF at ¶ 85.)  He testified that he saw a man on his stomach being arrested by one officer who was sitting or kneeling on the man.  (See Defs.' SOF at ¶¶ 86-87; Pl.'s SOF at ¶¶ 86-87; dkt. entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. R, Sorace Dep. 7:1-8:2, Mar. 4, 2013.)  Sorace further testified that he did not see anything inappropriate with regard to the plaintiff's arrest, and he never saw the plaintiff being lifted off of the ground.  (See Defs.' SOF at ¶ 89; Pl.'s SOF at ¶ 89.)

Gsell testified that when he arrived at the scene he saw the plaintiff – whom he described as "a really well-put together dude, a very muscular guy" – seated directly in front of the entrance of the ice cream parlor.  (See Defs.' SOF at ¶ 98; Pl.'s SOF at ¶ 98.)  Gsell noted in his deposition that he knew both of the defendants.  (See Defs.' SOF at ¶ 107; Pl.'s SOF at ¶ 107.)[3]  In regard to the arrest, Gsell testified that an unknown male officer attempted to pick the plaintiff up, but could not.  (See Defs.' SOF at ¶ 108; Pl.'s SOF at ¶ 108.)  Gsell stated that when the officer "tried to pull[] him one way, he went the other way. . . .  [he would] just

---

[3] Gsell testified that he knew Officer Fisher since he was ten years old, and that they went to school together.  (See Defs.' SOF at ¶ 107; Pl.'s SOF at ¶ 107.)  Gsell further testified that he knew Sergeant McCormick from seeing him in Court.  (See id.)

lock up. . . . [I]t was like a sling shot." (See Defs.' SOF at ¶¶ 117-18; Pl.'s SOF at ¶¶ 117-18; dkt. entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. T, Gsell Dep. 151:13-14, 151:17, 157:20-21, Dec. 13, 2012.) He stated that a second unknown male officer came over, and together the two officers picked the plaintiff up and either slammed or dropped him to the ground. (See Defs.' SOF at ¶ 108; Pl.'s SOF at ¶ 108.) The plaintiff testified that it was Officer Raniere who picked him up and slammed him to the ground. (See Ayala Dep. 489:19-490:4.) He further testified he was never told that it was either of the defendants who slammed him. (See id. at 490:5-8.)

Gsell testified that once the plaintiff was on the ground, the two unknown officers attempted to handcuff him; "one of them had his knee directly in the back of his neck. . . . And the other officer was trying to get his arms and trying to get him handcuffed." (See Defs.' SOF at ¶ 119; Pl.'s SOF at ¶ 119; Gsell Dep. 86:1-7.) Gsell acknowledged both that he did not have any knowledge of the level of tension the officers were experiencing as they were pulling his arms back, and that he did not recall how the plaintiff was handcuffed. (See Gsell Dep. 88:22-89:1, 161:2-5.) Gsell stated that the plaintiff may have been having a seizure at some point during the arrest. (See Gsell Dep. 149:2-6.)

The plaintiff was charged with disorderly conduct, resisting arrest, and possession of a controlled dangerous substance under 50

grams.  (See Defs.' SOF at ¶ 58; Pl.'s SOF at ¶ 58.)  The plaintiff

testified that after he was charged, his brother-in-law, Glenn

Marton, picked him up from the police station and took him to

Marton's house.  (See Defs.' SOF at ¶ 70; Pl.'s SOF at ¶ 70.)  He

claims that when he awoke the next day, he felt soreness in his

head, face, and back, and his tongue was chewed up.  (See Defs.'

SOF at ¶ 72; Pl.'s SOF at ¶ 72.)  The plaintiff proceeded to walk

two miles to Somerset Medical Center, where he was diagnosed with a

back strain, abrasions, and bruising.  (See Defs.' SOF at ¶¶ 72-74;

Pl.'s SOF at ¶¶ 72-74.)  The plaintiff did not break any bones,

receive any stitches, undergo any surgery, experience any

dislocations, receive any treatment for his tongue, or sustain a

concussion as a result of his arrest.  (See Defs.' SOF at ¶¶ 74,

76; Pl.'s SOF at ¶¶ 74, 76.)

## III. ANALYSIS

Section 1983 provides a private cause of action against any

person who, acting under color of state law, deprives another of

rights, privileges, or immunities secured by the Constitution or

laws of the United States.  The statute, in and of itself, is not a

source of substantive rights, but provides "a method for

vindicating federal rights elsewhere conferred."  See Graham v.

Connor, 490 U.S. 386, 393-94 (1989) (internal quotation marks

omitted).  For a Section 1983 claim to survive a motion for summary

judgment, there must be a genuine issue of material fact as to

whether the defendant (1) acted under color of state law, and (2) deprived the plaintiff of a federal right.  See Groman v. Twp. Of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

"The color of state law element is a threshold issue; there is no liability under [Section] 1983 for those not acting under color of law."  Id. at 638.  There is no dispute here that the defendants acted under the color of state law.

Once it has been established that the defendants acted under color of state law, the Court must identify the federal right the defendants allegedly violated.  See Groman, 47 F.3d at 633.  As discussed in more detail below, the Court finds that the plaintiff has not sufficiently demonstrated that the defendants violated any of his constitutional rights.  Thus they cannot be held liable under Section 1983.  See Reyes v. City of Trenton, No. 05-1882, 2007 WL 1038482, at *3 (D.N.J. Mar. 30, 2007).

A.   **The Plaintiff's Excessive Force Claim**

The plaintiff claims that the defendants violated his constitutional rights by subjecting him to excessive force during the course of the August 1, 2007 arrest.  (See generally Compl.; Pl. Cause of Action List.)  The defendants argue that (1) the plaintiff does not assert any allegations of excessive force against the defendants, (2) the record is devoid of any competent evidence establishing that the defendants used excessive force, and (3) even if the Court finds that the defendants used excessive

force, they are entitled to qualified immunity. (See Defs.' Br. at 11-24.) The plaintiff's excessive force claim fails here because the plaintiff has not shown that the defendants violated a constitutional right in effecting his arrest.

Claims of excessive force by a police officer are evaluated under the Fourth Amendment's "objective reasonableness" standard. See Brosseau v. Haugen, 543 U.S. 194, 197 (2004); see also Graham 490 U.S. at 397 ("As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). In Graham, the Supreme Court of the United States expounded on the reasonableness inquiry, stating that it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." See id. at 396. The Third Circuit Court of Appeals has noted other relevant factors including "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." See Sharrar v. Felsing, 128

F.3d 810, 822 (3d Cir. 1997), <u>abrogated on other grounds</u>, <u>Curley v.</u>
<u>Klem</u>, 499 F.3d 199 (3d Cir. 2007).

When weighing these factors, courts should evaluate the
officers' conduct from the officers' vantage point at the time of
the incident.  <u>See</u> <u>Graham</u>, 490 U.S. at 396.  The reasonableness of
a particular use of force therefore

> must be judged from the perspective of a reasonable
> officer on the scene, rather than with the 20/20 vision
> of hindsight. . . .  Not every push or shove, even if it
> may later seem unnecessary in the peace of a judge's
> chambers, violates the Fourth Amendment.  The calculus
> of reasonableness must embody allowance for the fact
> that police officers are often forced to make split-
> second judgments - in circumstances that are tense,
> uncertain, and rapidly evolving - about the amount of
> force that is necessary in a particular situation.

<u>See</u> <u>id.</u> at 396-97 (internal citations and quotation marks omitted).

The plaintiff's excessive force claim is based exclusively on
the testimony of the eyewitnesses, as the plaintiff himself has no
independent recollection of the arrest.  (<u>See</u> Defs.' SOF at ¶ 83;
Pl.'s SOF at ¶ 83; Ayala Dep. 489:4-17.)  While the plaintiff
concedes that it was Officer Raniere, and not either of the
defendants, who allegedly picked him up and slammed him on the
ground, the plaintiff asserts that Sergeant McCormick, Officer
Fisher, and Officer Raniere restrained him in such a manner that
caused numerous cuts and bruises across his body.  (<u>See</u> Opp'n Br.
at 8; Ayala Dep. 489:19-490:8.)  The plaintiff further argues that
because his movements were involuntary and caused by a seizure

rather than resisting arrest, "[p]inning [him] to the ground and restricting his movement was not a reasonable response to his behavior."  (See Opp'n Br. at 10.)

Contrary to the plaintiff's assertions, the evidence in the record does not substantiate his contention that the defendants violated his constitutional rights.  It is undisputed that the plaintiff suffered at least some injuries from the arrest, however, there is insufficient evidence to support the plaintiff's contention that his injuries were caused by excessive force perpetrated by the defendants.  Plaintiff testified that (1) his claim of excessive force against the defendants is based exclusively on the testimony of the eyewitnesses, and (2) Sergeant McCormick, Officer Fisher, and Officer Raniere restrained him in such a manner that caused numerous cuts and bruises across his body.  (See Opp'n Br. at 8; Ayala Dep. 489:19-490:8.)  Yet, neither of the eyewitnesses positively identified either of the defendants as the officers who restrained him.  While Gsell's testimony is clear that he knew both of the defendants, not only did Gsell say that it was two unknown male officers that slammed the plaintiff to the ground, but he also did not identify the defendants as the officers who were applying the compliance holds when the plaintiff was on the ground.  (See Defs.' SOF at ¶¶ 107, 119; Pl.'s SOF at ¶¶ 107, 119; Gsell Dep. 86:1-7.)

While this, in and of itself, may not be enough of a deficiency for the Court to grant the Motion, the Court notes that Gsell's testimony is riddled with uncertainty.  Even the plaintiff concedes that "Gsell's testimony may seem to be inconclusive." (See Opp'n Br. at 9.)  See generally Hennings v. Twp. of Blairstown, No. 08-3735, 2010 WL 2179507, at *7-8 (D.N.J. May 28, 2010) (finding that eyewitness testimony was "riddled with uncertainty" regarding whether plaintiff was pushed by officer during arrest, and thus plaintiff could not make out excessive force claim).

The plaintiff moreover does not identify which injuries were sustained as a result of the arrest and which were sustained as a result of the alleged seizure.  The plaintiff's testimony itself discloses that the alleged seizure was the source of many of his injuries:

> **Q.**   . . . .  Earlier you noted that you were in pain when you woke up in the police station?
>
> **A.**   Um-hum.
>
> **Q.**   Do you recall what hurt specifically, which parts of your body, if anywhere?
>
> **A.**   My face, my back, my tongue, my head.
>
> . . . .
>
> **Q.**   And you said your tongue hurt?
>
> **A.**   My tongue, during the seizure, the body jerks and my tongue was bitten pretty bad.

17

**Q.**   Would you describe the pain in your face [as] muscle pain from clenching your jaw?

**A.**   My tongue, just lumps and bumps on my head and bruises and scratches on my face.

**Q.**   What about the rest of your body, were you hurting anywhere else?

**A.**   Yes, I was.

**Q.**   Where?

**A.**   My back was hurting.  I had indentations on my wrist from being handcuffed.

**Q.**   Okay.  Where else?

**A.**   <u>I was sore all over.  During a seizure, your body goes through involuntary muscle spasms, so, my legs, my back.</u>

(Ayala Dep. 468:10-469:24.)  The plaintiff also does not identify which injuries were sustained as a result of Officer Raniere allegedly slamming or dropping the plaintiff, and which injuries were sustained as a result of the defendants' act of restraining the plaintiff.[4]  Such uncertainty calls into question which of the plaintiff's injuries were solely the result of the defendants' conduct.

---

[4] The plaintiff does argue that he sustained "numerous cuts and bruises across his body" from being restrained, but he states that it was not only the defendants that restrained him but also nonparty Officer Raniere.  (<u>See</u> Opp'n Br. at 8.)

The Court has nevertheless considered the reasonableness of
the level of force the defendants used to arrest the plaintiff and
finds that such force was objectively reasonable under the
circumstances.  The defendants responded to a report of a man
acting in a disorderly manner, and when they arrived on the scene,
they witnessed a muscular man blocking the entrance of an ice cream
parlor.  (See Defs.' SOF at ¶¶ 5, 15, 17; Pl.'s SOF at ¶¶ 5, 15,
17.)[5]  The defendants repeatedly instructed the plaintiff to move
away from the entrance of the ice cream parlor, so as not to
disrupt patrons.  (See e.g., Defs.' SOF at ¶¶ 27-29.)  When Officer
Fisher attempted to assist the plaintiff, the plaintiff pulled away
from Officer Fisher's grasp in what Sergeant McCormick described as
a willful and violent manner.  (See id. at ¶ 36.)  At that point,
Sergeant McCormick believed that the plaintiff was going to start
fighting the officers "with everything he had."  (See id. at ¶ 37.)
Officer Fisher then attempted to arrest the plaintiff, but the
plaintiff began moving in a fashion that caused the officers and at
least one eyewitness – Candace Bauer - to believe he was resisting
arrest.  (See McCormick Dep. 60:8-13; Fisher Dep. 39:10-12; dkt.
entry no. 84-3, Certification of Richard H. Bauch, Esq., Ex. I,
Raniere Dep. 26:19-27:10, May 20, 2013; Aff. of Candace Bauer at ¶¶
10-12.)

---

[5] The plaintiff himself described his actions prior to the
officers' arrival as being a "public outburst."  (See Opp'n Br. at
1.)

The defendants testified that they (1) are trained to recognize an individual who is experiencing a seizure, (2) know the characteristics an individual experiencing a seizure would exhibit, and (3) have witnessed more than ten people in the midst of a seizure during their tenure as police officers. (See McCormick Dep. 20:3-21:25; Fisher Dep. 19:21-21:16.)  The defendants further testified that even after learning that the plaintiff suffers from a seizure disorder – which they learned after the arrest - there was nothing about the plaintiff's demeanor during the encounter in front of the ice cream parlor that led them to think that he was having a seizure at that time.  (See McCormick Dep. 50:1-7; Fisher Dep. 47:25-48:5.)  Bauer also did not believe that the plaintiff was suffering from a seizure.  (See Aff. of Candace Bauer at ¶ 13.) Given that the defendants were trained to recognize an individual who is experiencing a seizure, have seen numerous seizures in the past, did not know the plaintiff had a seizure disorder, and did not think that the plaintiff's behavior was consistent with that of an individual experiencing a seizure, it was not unreasonable for them to believe that the plaintiff was resisting arrest rather than having a seizure.  As such, it was objectively reasonable for the defendants to use at least some level of force to arrest the plaintiff.

The considerations set forth in Graham and Sharrar suggest that the defendants also acted reasonably with regard to the amount

of force used under the circumstances.  Weighing in favor of the
plaintiff is the fact that the crimes at issue were not
particularly severe and the officers did not need to contend with a
number of individuals at one time.  See Graham, 490 U.S. at 396;
Sharrar, 128 F.3d at 822.

These considerations, however, are outweighed by several
factors that favor the defendants.  The defendants' use of force
took place in the context of effecting an arrest, and the
defendants perceived the plaintiff to be actively resisting arrest.
See id.  Although the plaintiff argues - albeit by deferring to
eyewitness testimony – that the officers violently tugged at his
arms in order to force them behind his back to apply handcuffs and
that Sergeant McCormick pinned the plaintiff down with his knee,
the plaintiff has not offered any evidence that the defendants'
restraint tactics went beyond the compliance holds they learned in
their police training.  The officers also believed that the
plaintiff, because of his actions and muscular physique, posed an
immediate threat to their safety and to the safety of the patrons
witnessing the confrontation.  See Graham, 490 U.S. at 396.  The
officers moreover could not rule out the possibility that the
plaintiff was armed, particularly in light of the fact that he had
not yet been searched, and he was keeping his hands underneath him.
Sharrar, 128 F.3d at 822.  The defendants thus have demonstrated
that their decision to use sufficient force to arrest the plaintiff

- including the use of various compliance holds - was objectively
reasonable in light of the facts and circumstances they confronted.
The Court accordingly will grant summary judgment in favor of the
defendants as to the plaintiff's excessive force claim.

### B.  The Plaintiff's Denial of Medical Care Claim

The plaintiff claims that the defendants violated his
constitutional rights by denying him medical care immediately
following the August 1, 2007 arrest.  (See generally Compl.; Pl.
Cause of Action List.)  "Failure to provide medical care to a
person in custody can rise to the level of a constitutional
violation under [Section] 1983 only if that failure rises to the
level of deliberate indifference to that person's serious medical
needs."  Groman, 47 F.3d at 637.  "This standard is in effect a
two-pronged test requiring that plaintiff prove: (1) that his
medical needs were objectively serious and (2) that defendant
exhibited deliberate indifference to those needs."  Mantz v. Chain,
239 F.Supp.2d 486, 504 (D.N.J. 2002) (internal quotation marks
omitted).

The plaintiff has not proffered sufficient evidence to prove
that his medical needs were objectively serious.  As an initial
matter, the plaintiff had the opportunity to go to the hospital the
same day he was arrested.  Yet, instead of immediately going to the
hospital when he was released from the police station, the
plaintiff went to his brother-in-law's home and went to bed.  (See

Defs.' SOF at ¶¶ 70-71; Pl.'s SOF at ¶¶ 70-71.)  The plaintiff did not seek out any medication or treatment before he went to bed. (See Ayala Dep. 461:2-9.)  It was not until the plaintiff woke up the next day feeling sore that he decided to go to the hospital. (See Defs.' SOF at ¶ 72; Pl.'s SOF at ¶ 72.)  The plaintiff walked two miles to the hospital, stopping at his sister's work along the way.  (See Ayala Dep. 462:21-23, 463:9-25, 464:18-20.)  The plaintiff also testified that he may have stopped on the way to the hospital to purchase a cup of coffee.  (See Ayala Dep. 464:9-12.)

Once at the hospital, the plaintiff was only diagnosed with a back strain, abrasions, and bruising.  (See Defs.' SOF at ¶¶ 72-74; Pl.'s SOF at ¶¶ 72-74.)  The plaintiff did not break any bones, receive any stitches, undergo any surgery, experience any dislocations, receive any treatment for his tongue, or sustain a concussion as a result of his arrest.  (See Defs.' SOF at ¶¶ 74, 76; Pl.'s SOF at ¶¶ 74, 76.)  Considering these facts, the Court finds that the plaintiff has not established that his medical needs were objectively serious.

Given that the plaintiff cannot establish on the record before the Court that his medical needs were objectively serious, the Court need not proceed to the second inquiry under the deliberate indifference analysis.  The Court accordingly will grant summary judgment in favor of the defendants as to the plaintiff's denial of medical care claim.

IV.  **THE FICTITIOUS DEFENDANTS**

The parties were earlier ordered to complete fact discovery in the action by March 29, 2013.  (See dkt. entry no. 76, 12-14-12 Scheduling Order.)  That deadline passed twelve months ago.  The plaintiff has nonetheless failed to identify the fictitious defendants.

"The case law is clear that fictitious parties must eventually be dismissed, if discovery yields no identities."  Hindes v. FDIC, 137 F.3d 148, 155 (3d Cir. 1998) (internal quotation marks omitted).  Because the plaintiff has failed to name the fictitious defendants, the Court will dismiss the claims asserted against those defendants from the action.

V.  **CONCLUSION**

The Court, for good cause appearing: (1) will dismiss the claims asserted against the fictitious defendants from the action; and (2) will grant the motion for summary judgment.  The Court will issue an appropriate order and judgment.


                                    s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge


Dated: March 28, 2014

24